WUERSCH & GERING LLP
Gregory F. Hauser (GH 3902)
100 Wall Street, 21st Fl.
New York, NY  10005
(212) 509-5050
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                        :

CAPITAL TRUST HOLDING AG,          :
                                          :

               Plaintiff,     :

                                          :    Docket No.:  07 Civ. 7318
          -against-          :    Hon. Colleen McMahon

                                          :

RAINMAKER INTERNATIONAL, INC.,  :
                                          :

             Defendant.   :

_____:

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR A PRELIMINARY INJUNCTION

Preliminary Statement

       The purported arbitration "agreement" on which defendant bases its motion to dismiss is too indefinite to enforce.  Defendant is, in any event, holding four million shares of Plaintiff's securities at issue that have not been collateralized by a loan and which Plaintiff has demanded be returned.  Whether the court orders arbitration or allows this action to proceed, Defendant should be preliminarily enjoined from selling or otherwise transferring those shares in order to preserve the *status quo*.

<u>Relevant Facts</u>

<u>The Parties</u>

Plaintiff Capital Trust Holding AG (hereinafter "CTH") is a stock corporation formed under the laws of Switzerland with its principal place of business in Switzerland. (Declaration of CEO Hany Salem, hereafter "Salem Decl.", ¶ 1.)

Defendant Rainmaker International, Inc. (hereinafter "Rainmaker"), is a Georgia corporation with its principal place of business in Savannah, Georgia. (Valdes Decl. ¶ 2.)

<u>The Contract at Issue</u>

On or about October 11, 2006, Rainmaker and CTH entered into a contract entitled "Non-Recourse Loan Agreement Including Stock Security Delivery and Re-Delivery Agreement" (hereinafter the "Agreement"). (Salem Decl. ¶ 2; Valdes Decl. ¶ 4 and Exs. 2 & 3.)

Rainmaker's acts from which this action arises include the transaction of business within this district, more specifically the receipt, holding and sale of the securities at issue for Rainmaker's account by Rainmaker's agent, First Clearing Corporation/ Fordham Financial Services, 14 Wall Street, New York, New York (Agreement § 1(b)), and the wiring of loan proceeds to an account at the Bank of New York (*id.* § 2(g)), facts which are the basis for the Court's jurisdiction over Rainmaker pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and N.Y. CPLR 302(a)(1), and for venue in this district pursuant to said Section 27 and 28 U.S.C. § 1391(b)(2) in that Rainmaker transacts business in this district and a substantial portion of the events or omissions giving rise to the claim occurred in this district, and/or a substantial part of the property that is the subject of the action is situated in this district.

Pursuant to the Agreement, CTH was to deliver up to forty million shares of Boulder Steel Limited ("BGD.AX"), termed under the Agreement as the Pledged Securities. (*Id.* § 1(a); Salem Decl. ¶ 3.) Boulder Steel is a publicly listed Australian corporation, whose shares are traded on the Australian Stock Exchange and several foreign exchanges. (Salem Decl. ¶ 3.)

Also pursuant to the Agreement, Rainmaker was to provide a series of non-recourse loans, collateralized by the BGD.AX shares in tranches of 500,000 shares each. (Agreement § 2; Salem Decl. ¶ 4.)

CTH delivered twenty-eight million shares of BGD.AX to Rainmaker pursuant to the Agreement, and Rainmaker funded loans collateralized by twenty-four million of these shares. The remaining four million shares remain with Rainmaker. (Salem Decl. ¶ 5.)

Pursuant to the Agreement:

(a)     the loans made are non-recourse, that is, Rainmaker acquired rights in the collateral in return for having no direct recourse against CTH with respect to the loans (Agreement at 1 and § 2);

(b)     Rainmaker has the right at any time after delivery by CTH to sell and to trade the Pledged Securities entirely at its discretion, *i.e.*, complete control for its own account (*id.* § 1(c));

(c)     "if the value of the securities upon repayment is in excess of 140% of the value of the pledged securities as calculated on day of loan closing per loan contract herein, then the Grantor [Rainmaker] shall be obligated to return to the Grantee

[CTH] 140% of the value of the pledged securities in cash or stock", *i.e.*, CTH will not

necessarily receive its shares back upon repayment of the loan (*id.* § 4(e)); and

>     (d)    in the event of default or breach by CTH, CTH loses all "rights,

claims or interest in the Pledged Securities", and Rainmaker "may take whole possession

and full unrestricted ownership of the Pledged Securities." (*Id.* §§ 3(b) & 5(b); Valdes

Decl. ¶ 4.)

Rainmaker's Business

>     On its website, www.rainmakerint.com, Rainmaker states:

>> Rainmaker International, Inc. provides investors access to sophisticated stock loans and stock loan services that were once only exclusively for large institutional and professional investors.

>> At Rainmaker International, Inc. we provide non-recourse, no margin call stock loans from 40%-90% of your stock position's value. Our resources can quickly accommodate sophisticated stock loans and borrowing power to smaller personal shareholder services.

>     As noted, the Agreement in fact provides for a non-recourse securities loan giving

Rainmaker the right to sell or to trade the Pledged Securities at any time after delivery by

CTH without restriction and the right upon default to foreclose on any or all of the Pledge

Securities, all of these rights without relationship to the extent to which loans have been

funded against the securities and remain outstanding or any other value has been

provided to CTH. (Salem Decl. ¶ 9; Valdes Decl. ¶ 5.)

>     Rainmaker regularly solicits and enters into such agreements. (Salem Decl. ¶ 10.)

>     Rainmaker thus (a) advertises that it is in the regular business of providing credit

directly to retail and international investors as part of larger transactions involving

securities, and (b) in the course of these transactions takes complete control over

securities delivered to it and regularly buys and sells securities for its own account as part of these overall transactions.

CTH's Demand for Rescission and Return of the Shares

Based on CTH's conclusion that the above-recited facts relating to the Agreement render it unlawful and void under the U.S. securities laws, CTH has demanded the return of the twenty-eight million shares of Boulder Steel Limited in return for repayment of the outstanding loan amounts, but Rainmaker has refused. (Salem Decl. ¶ 11.)

Rainmaker has instead declared CTH in default with respect to the twenty-four million (24,000,000) collateralized shares of BGD.AX. (Salem Decl. ¶ 12 and Ex. A.)

CTH has specifically and repeatedly demanded that Rainmaker return the four million (4,000,000) shares of BGD.AX which are not collateralized by loans and as to which there is no declared default. (Salem Decl. ¶ 13 and Ex. B.) Rainmaker has not responded to any of these demands to return the four million non-collateralized shares. (Salem Decl. ¶ 14.) As a result, CTH seeks the return of those shares in this action and would seek the same relief if relegated to arbitration. (Salem Decl. ¶ 15.)

As of October 11, 2006, the market price of Boulder Steel was A$0.54 per share; it is most recently A$0.32 per share. (Salem Decl. ¶ 16.)

Rainmaker is a firm with only an apparently modest scale of operation, and is unlikely to be able to pay the million dollars plus value of the four million shares if it is unable to deliver the shares themselves. (Salem Decl. ¶ 17 and Ex. C.)

<u>Argument</u>

I

<u>DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE
PURPORTED ARBITRATION AGREEMENT IS INSUFFICIENTLY DEFINITE</u>

Defendant seeks enforcement of a purported arbitration agreement.  Section 2 of
the Federal Arbitration Act provides that "such grounds as exist at law or in equity"
defeating the enforcement of any contract will similarly defeat the enforcement of an
arbitration agreement. 9 U.S.C. § 2.

The Agreement at issue provides that it is governed by Georgia law.  (Agreement
§ 8(c)(i).)  Under Georgia law, specific enforcement of a contract term requires that it "be
certain, definite and clear; and so precise in its terms that neither party can reasonably
misunderstand it." *E.g.*, *Hibbard v. McMillan*, 284 Ga. App. 753, 755, 645 S.E.2d 356,
359 (Ct. App. 2007).

The clause at issue purports to provide for arbitration "in accordance with the
rules of the Arbitration [*sic*] then in force in Savannah, Georgia, for resolution of
commercial disputes."  Thus, the clause - - supplied by Defendant (Salem Decl. ¶ 7) - -
fails to specify a tribunal and a set of rules.

Failure to specify a tribunal or rules leaves the arbitration supposedly agreed to so
indefinite as to prevent understanding of the parties' supposed agreement.  There can be
no certainty sufficient for enforcement without the essentials of procedure and presiding
authority.  As a result, the agreement fails to qualify for enforcement under Section 2 of
Federal Arbitration Act.[1]

Defendant's motion to dismiss should therefore be denied.

---

[1] As an additional result, the case law cited by Defendant is inapplicable since there is no enforceable
arbitration agreement in the case at bar.

II

## DEFENDANT SHOULD BE PRELIMINARILY ENJOINED FROM SALE OR TRANSFER OF ANY OF THE FOUR MILLION NON-COLLATERALIZED SHARES

Plaintiff has specifically and repeatedly demanded the return of the four million non-collateralized shares, seeks their return as relief in this action, and will seek the same relief in any arbitration. (Salem Decl. ¶¶ 11-15.) Defendant has simply not responded to Plaintiff's demands. Rainmaker's retention of the shares means that they are subject to sale or transfer at Rainmaker's discretion, and any such transaction would, if Plaintiff prevails on its claim for rescission of the Agreement, constitute both Rainmaker's renewed violation of the Securities Laws by Rainmaker and the illicit disposal of Plaintiff's property pursuant to a purported contract that is void as a matter of law. Sale or other transfer would also render impossible the return of the shares and thus defeat the equitable relief to which Plaintiff is entitled if it prevails on its claim for rescission.

The Court should therefore restrain Defendant from any disposal of the shares, whether as preliminary relief in this action or, if the Court grants Defendant's motion, as an injunction in aid of arbitration to preserve the *status quo*, relief within the Court's equity powers. *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433-34 (2d Cir. 1993); *Roso-Lino Beverages Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-27 (2d Cir. 1984); *Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468 (2d Cir. 1980); *Allergan Optical, Inc. v. Cohen*, 15 U.S.P.Q.2d (BNA) 1810 (E.D.N.Y. 1990); *Givenchy S.A. v. William Stuart Indus.* (No. 85 Civ. 9911 (PKL)), 1986 U.S. Dist. LEXIS 28403, at *14-22 (S.D.N.Y. Mar. 10, 1986).

As this same line of authority shows, the Court's legal and factual analysis to determine whether to grant the order is the same under either legal theory since the relief

sought is not grounded on enforcement of any specific language in the Agreement but on its voidability; as a result, Plaintiff must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of equities tipping decidedly in its favor.

A.     Irreparable Harm

This is not a simple case of a dispute over some shares of stock that, if they cannot be delivered, can be replaced by cash for their value.

This is instead a case of a claim for rescission against an unregistered broker-dealer, any stock sale by which will be a new violation of the Securities Laws, and an entity that is basically a loan broker and stock dealer employing a handful of people, one unlikely to have sufficient assets to satisfy such an obligation if the stock is no longer on hand.  Under these circumstances, irreparable harm if the shares are not frozen has been demonstrated. *See HIMC Corp. v. Ramchandi* (No. C07-5342 FDB), 2007 U.S. Dist. LEXIS 56797, at *5-8 (W.D. Wash. Aug. 3, 2007) (rescission claim for delivery of stock); *Alpha Capital AG v. Advanced Viral Research Corp.* (No. 02CV 10237 (GBD)), 2003 U.S. Dist. LEXIS 2077, at *12-16 (S.D.N.Y. Feb. 11, 2003) (claim for equitable relief - - delivery of stock - - and absence of evidence that defendant could pay a monetary judgment); *Castle Creek Tech. Partners, LLC v. Cellpoint Inc.* (No. 02Civ. 6662 (GEL)), 2002 U.S. Dist. LEXIS 23760, at *9-14 (S.D.N.Y. Dec. 9, 2002) (claim for delivery of stock and defendant not likely to be able to pay monetary judgment); *cf. SEC v. Yu*, 231 F. Supp. 2d 16 (D.D.C. 2002) (granting preliminary injunction to avert likelihood of violation of securities law); *SEC v. Century Investment Transfer Corp.* (No.

71 Civ. 3384), 1971 U.S. Dist. LEXIS 11364, at *13-16 (S.D.N.Y. Oct. 5, 1971)

(granting preliminary injunction to prevent, *inter alia*, continued violations by

unregistered broker-dealer).

B.    Merits of Plaintiff's Claims

Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15

U.S.C. § 78o(a)(1), states that:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.[2]

Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), states, in relevant part,

that

> Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void.

Section 3(a)(5)(A) of the Exchange Act defines the term "Dealer" as: "any

person engaged in the business of buying and selling securities for such person's own

account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A). There is an

---

[2]    The Exchange Act provides for several exemptions from registration which are not applicable. See Sections 3(a)(4)-(5), 15 U.S.C. §§ 78c(4)-(5).

exemption for those termed "traders": "The term "dealer" does not include a person that buys or sells securities for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business." 15 U.S.C. § 78c(a)(5)(B).

Rainmaker is not excluded from the definition of a dealer as a "trader" because it both buys and sells securities for its own account and is engaged in doing so as part of a regular business, in Rainmaker's case, the business of providing loans to its customers. Because of the extent of the rights its loan agreements give Rainmaker over the Pledged Securities, it is buying and selling securities for its own account as part of its regular business. Rainmaker is thus a "dealer" within the meaning of Section 3(a)(5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(c)(a)(5). Indeed, the loan agreements gives Rainmaker such control over, and rights in, the securities delivered to it that the loan agreements are *de facto* stock repurchase agreements in which customers sell the stock to a dealer with the possibility of a later repurchase, and the Securities Exchange Commission has taken the position that dealers in such stock repurchase agreements are dealers. In other words, the loan terms mean that the loans are, within the meaning of the securities laws, effectively purchases of securities by Rainmaker for its own account.

The U.S. Securities & Exchange Commission Guide to Broker-Dealer Registration provides in relevant part, the following:

> II. B. Who is a "Dealer"
>
> Unlike a broker, who acts as agent, a dealer acts as principal. Section 3(a)(5)(A) of the Act generally defines a "dealer" as: any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise. The definition of "dealer" does not include a "trader," that is, a person who buys and sells securities for his or her own account, either individually or in a fiduciary capacity, but not as part of a regular business. Individuals who buy and sell securities for

themselves generally are considered traders and not dealers. Sometimes you can easily tell if someone is a dealer. For example, a firm that advertises publicly that it makes a market in securities is obviously a dealer. Other situations can be less clear. For instance, each of the following individuals and businesses may need to register as a dealer, depending on a number of factors:

- a person who holds himself out as being willing to buy and sell a particular security on a continuous basis;

- a person who runs a matched book of repurchase agreements; or

- a person who issues or originates securities that he also buys and sells.

Here are some of the questions you should ask to determine whether you are acting as a dealer:

- Do you advertise or otherwise let others know that you are in the business of buying and selling securities?

- Do you do business with the public (either retail or institutional)?

- Do you make a market in, or quote prices for both purchases and sales of, one or more securities?

- Do you participate in a "selling group" or otherwise underwrite securities?

- Do you provide services to investors, such as handling money and securities, extending credit, or giving investment advice?

- Do you write derivatives contracts that are securities?

A "yes" answer to any of these questions indicates that you may need to register as a dealer.

Rainmaker must answer "yes" to more than one of these questions. It advertises that it provides loans, loans whose terms in fact put Rainmaker in the business of buying and selling securities. It does business with the public, indeed, specifically aims its

business at smaller investors. It provides credit and handles securities for its customers.

The SEC staff in its "no-action" letter indicates their position that a person who holds himself out to the public as willing to buy and sell securities will be considered a dealer:

- The staff advised a private investor who wished to advertise his willingness to buy securities directly from the public and to sell securities directly to the public, that registration would be required "if such activity is engaged in more often than on a single isolated basis, and if the advertisements encompass offers to buy as well as to sell. . . ."[3]

- The SEC took the position that a person must register as a broker-dealer, where he held himself out to the public as willing to purchase their stock and then sold the stock for his own account through a registered broker-dealer.[4]

- The SEC staff gave a favorable no-action letter to an investment partnership whose business was that of buying businesses and directly participating in their management and strategic planning in order to enhance their value. The partnership's purchases of securities would in most cases put the partnership in a position to exercise significant influence over the management and operations of the companies in which the partnership invested, and all of the partnership's investments would be made with a view toward long-term appreciation in value rather than immediate resale. **The SEC staff's position that the partnership was not required to register as a broker-dealer was based in part on the partnership's representation that it would not ... extend or arrange for the extension of credit on securities or lend any securities.**[5]

The reasoning of these letters makes clear that Rainmaker's activities meet the definition of "dealer". It offers loan agreements that are as a practical matter agreements to buy and to sell securities, and the Agreement at issue is clearly not an isolated instance. It in fact buys and sells securities as part of the loan transactions, apparently through a

---

[3]     Joseph McCulley Sales, SEC No-Action Letter, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) P78,982 at 82,111 (Sept. 1, 1972).

[4]     Instant Funds, Inc., SEC No-Action Letter, 1971 WL 8293 (Mar. 14, 1971).

[5]     Davenport Management, Inc., SEC No-Action Letter, 1993 WL 120436, at *12 (Apr. 13, 1993).

registered broker dealer. And it extends credit based on the initial delivery of the securities it then subsequently buys and sells.

The non-recourse loans issued in tranches under the Agreement are an indication of Rainmaker's willingness to buy and to sell, as clearly contemplated under the Agreement, a particular security (in this case, the BDG Shares) on a continuous basis to the extent of the shares available in tranches under the Agreement.

The Agreement provides Rainmaker with the right to sell or trade the Pledged Securities at any time during the term of the Agreement as if it were the owner of the Pledged Securities. In the event of default, Rainmaker may foreclose on all of the Pledged Securities irrespective of equitable notions of unjust enrichment or value. The definitions of "broker" and "dealer" both require that the person be "engaged in the business" of buying and selling securities. The critical test as to whether a person is engaged in the business of being a broker or dealer is whether there is regularity of securities activity, as opposed to isolated securities transactions.[6] And Rainmaker's own description of itself and its business, as already quoted from its website, makes it clear that this is its regular business. Rainmaker is holding itself out to the public as ready, willing and able to engage in transactions involving non-recourse securities loans, *i.e.*, it is regularly "engaged in the business" of securities activity, as opposed to isolated securities transactions.

---

[6] Other factors that will be considered in determining whether a person is engaged in the business of buying and selling securities are whether the entity receives transaction-based compensation (i.e., commissions), whether it advertises for clients, whether it has custody of clients' funds and securities, whether it gives advice to investors, whether it is involved in negotiations for the sale of securities to investors, and whether it actively seeks out investors. Norman S. Poser, Broker-Dealer Law and Regulation (2d ed. 2001).

Rainmaker may attempt to characterize some of its activities as trading.  The "trader" exception to the definition of "dealer" is often claimed by hedge funds.  The SEC staff has generally taken the position that a hedge fund is not required to register as a dealer if it: does not handle other people's money or securities; does not hold itself out as being willing to buy and sell securities for its own account on a continuous basis; and does not furnish the services that are usually provided by dealers, such as … extending or arranging the extension of credit in connection with securities activities.[7]   None of these saves Rainmaker from the definition of dealer.  In fact, all of them apply and thus clearly defeat any Rainmaker claim to be a "trader".

Rainmaker may also try to argue that, because all the transactions were intermediated by registered broker dealers, its transactions involving securities did not require registration.  The SEC staff, however, has taken the clear position that "independent contractor salespersons who act as independent principals, in selling or inducing the purchase or sale of securities must be registered with the Commission as broker-dealers."[8]

Applying the definition of "dealer" to Rainmaker is this case is consistent with the public policy in favor of regulating stock loan transactions.  Section 7 of the Exchange Act, 15 U.S.C. § 78g, regulates the extent to which a brokerage firm may act as a creditor of the customer and make loans against stock.  They are further regulated by the Federal Reserve System, the exchange, and the NASD.  When a customer has a margin account, firms will lend customers part of the purchase price of the security and then hold the

---

[7]   <u>National Council of Savings Inst.</u>, SEC No-Action Letter, 1986 WL 67129, at *5 (July 27, 1986).

[8]   Gordon S. Macklin, 1982-1983 *Fed. Sec. L. Rep. (CCH) P77,303* (avail. July 19, 1982);*see also* First Commerce Trust Co., 1982-1983 *Fed. Sec. L. Rep. (CCH) P77,390* (avail. Feb. 28, 1983) (independent salespersons); *Instant Funds*, supra.

Case 1:07-cv-07318-CM    Document 12    Filed 09/26/2007    Page 15 of 17

securities as collateral for the loans.  As creditors of the customers and pledgees of the customers' securities, the firms recognize that they act primarily in their own interests, not primarily in the interests of their customers. The concern of many brokerage firms in protecting their own interests can be seen from the fact that, while the NYSE has "maintenance margin" rules requiring a minimum level of collateralization of margin loans,[9] these firms have established even higher margin requirements.[10]   Similarly, Rainmaker acts primarily in its own interest when it accepts the Pledged Securities under the terms of its loan agreements.  Rather than establish margin requirements, Rainmaker assumes virtually total control over the securities.

Under the Exchange Act, registered brokers were originally limited to making loans against collateral in amounts which could not exceed the higher of 55% of the current market price of the security, or 100% of the lowest market price of the security during the preceding thirty-six calendar months, but not more than 75% of the current market price.  The Board of Governors of the Federal Reserve System was granted explicit authority in the Exchange Act, "with respect to all or specified securities or transactions, or classes of securities, or classes of transactions, by such rules and regulations (1) prescribe such lower margin requirements for the initial extension or maintenance of credit as it deems necessary or appropriate for the accommodation of commerce and industry, having due regard to the general credit situation of the country, and (2) prescribe such higher margin requirements for the initial extension or

---

[9]     NYSE Rule 431, NYSE Guide (CCH) P2431 (1990).

[10]    Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Perelle, 514 A.2d 552, 564-565 (Pa. Super. Ct. 1986) (concurring opinion by Judge Hoffman); *see also* Merrill Lynch Futures, Inc. v. Sands, 727 A.2d 1009, 1013-14 (N.H. 1999) (broker-dealer is under no obligation to liquidate a customer's nondiscretionary commodity account immediately in order to mitigate the customer's damages, when the customer announces that margin calls cannot or will not be met; but the broker-dealer must act in a commercially reasonable manner when the customer expresses a desire to liquidate).

maintenance of credit as it may deem necessary or appropriate to prevent the excessive use of credit to finance transactions in securities."[11]

- Regulation T is currently in effect as issued by the Board of Governors of the Federal Reserve System pursuant to the Exchange Act.[12] Its principal purpose is to regulate extensions of credit by brokers and dealers; it also covers related transactions within the Board's authority under the Act. It imposes, among other obligations, initial margin requirements and payment rules on certain securities transactions. Currently, under Regulation T, a borrower may borrow up to 50% of the purchase price of securities that can be purchased on margin. This is referred to as the initial margin.

- In juxtaposition to the limitations of such rules applicable to registered broker-dealers, Rainmaker agreed to advance 65% of the lesser of (i) $0.392 or the closing bid price on the day prior to the Closing; or the average bid price for the 10 days immediately prior to the Closing.

Rainmaker has attempted to skirt both dealer registration requirements and limits on stock loan terms. The regulation of loans made by registered broker-dealers and banks is indicative of a strong public policy enunciated through the Exchange Act by Congress and through the rules, regulations and guidance provided by the SEC and Treasury Department to regulate loan transactions made in respect of securities. The force of the definition of dealer and the regulatory scheme of which it is a key part are readily apparent. It would defy the public policies established by Congress and the regulatory authorities to permit ongoing non-recourse stock loan transactions, which effectively amount to purchase and sales of securities on a regular basis, outside the scope of governmental oversight and consumer protection. Rainmaker should be adjudged a dealer and subject to the registration requirement that would begin to provide

---

[11]     Exchange Act Section 7(b); 15 U.S.C. § 78g(b).

[12]     12 CFR § 220.1 et seq.

16

the appropriate oversight, and CTH would then have the right to declare the Agreement void.

Plaintiff has thus demonstrated a likelihood of services on the merits or, at the very least, sufficiently serious questions going to the merits to make them a fair ground for litigation. Because the four million shares at issue are Plaintiff's property and not collateralized for any outstanding loans, the balance of equities tips decidedly in its favor. Finally, if the Court grants the preliminary injunction but is also of the view that the remainder of the dispute should be arbitrated, the Court should stay the action pursuant to Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, rather than dismiss the action, retaining jurisdiction to oversee the injunction.

Conclusion

For the foregoing reasons, Defendant's motion should be dismissed and Plaintiff's cross-motion for a preliminary injunction should be granted.

Dated:  September 26, 2007

WUERSCH & GERING LLP

By_____
Gregory F. Hauser (GH 3902)
100 Wall Street, 21st Floor
New York, NY 10005
(212) 509-5050

*Attorneys for Plaintiff*
*Capital Trust Holding AG*